METZGAR REGISTER CO. *v.* THOMAS CANNING CO.

1. LANDLORD AND TENANT—COMPROMISE AND SETTLEMENT—RECEIPT
—EVIDENCE—EXTENT OF SETTLEMENT.

In a suit by a landlord against its tenant for damages to the leased building by overloading the second floor and to its personal property on the ground floor by tomato pulp leaking through, defendant's claim that a settlement evidenced by a receipt "in full payment for damage done on account of leakage of pulp, etc.," was in full for all damages prior to the date of said settlement, *held*, not sustained by either said written receipt or the oral evidence.

2. SAME—EXERCISE OF OPTION TO RENEW KEEPS IN FORCE COVENANTS OF LEASE.

Where a tenant exercised its privilege to renew a lease for another year by giving notice within the provided time, continuing in possession, and paying rent, the covenant in the lease to repair was in force in the new term, since, unless otherwise specified, the conditions of the new term are the same as the first except the privilege of renewal.

3. SAME—COVENANT TO REPAIR BINDING EVEN AS AGAINST ACTS OF THIRD PARTIES.

Although government officials condemned the pulp, took possession of it, and forbade its removal, defendant is liable for the damage done during the time the government was in possession, where it took no steps to relieve the situation, since its covenant of repair was binding upon it even as against the acts of third parties.

4. EVIDENCE—ORAL EVIDENCE INADMISSIBLE TO MODIFY TERMS OF WRITTEN LEASE.

Oral representations by landlord's manager during negotiations for a lease as to the strength of the floor of the leased building are inadmissible in evidence to modify the terms of the written lease in an action against the tenant on a covenant to repair.

5. LANDLORD AND TENANT — NEGLIGENCE — TENANT LIABLE FOR
   DAMAGE TO PERSONALTY CAUSED BY NEGLIGENCE.

   A tenant's neglect to care for bursting cans of tomato
   pulp, which leaked through the floor on the second story
   and damaged personal property of the landlord on the
   ground floor, rendered it liable for said damage although
   at the time said pulp had been condemned and was in
   possession of government officials, and said damage was
   not covered by its covenant to repair.

Error to superior court of Grand Rapids; Dunham
(Major L.), J. Submitted April 20, 1922. (Docket
No. 87.) Decided November 2, 1922.

Case by the Metzgar Register Company against the
Thomas Canning Company for damages to certain
leased premises. Judgment for plaintiff. Defendant
brings error. Affirmed.

*Colin P. Campbell,* for appellant.

*Jewell & Smith,* for appellee.

STEERE, J. Defendant was a tenant of plaintiff
from December 10, 1918, to June 10, 1920, of premises
consisting of the second floor and a part of the lower
floor in a brick building or block owned by plaintiff.
It entered into possession under a lease for one year
at a rental of $215 monthly in advance for the first
six months, and $190 per month in advance for the last
six months, with privilege of a second year, on 60
days' notice before the expiration of the first year.
Such notice was given on October 3, 1919. Without
further writings between them defendant continued
to occupy the premises and pay rent until June 10,
1920, when by mutual consent it surrendered the
premises and terminated its tenancy. Defendant
leased and used the premises for storage purposes and
stored there large quantities of tomato pulp, much of
which was in 5-gallon tin cans weighing 47 pounds

each.   Its lease contained the following customary provision:

"And also, that the said party of the second part will, at his own expense, during the continuance of this lease, keep said premises and every part thereof in as good repair, and at the expiration of the term yield and deliver up the same in like condition as when taken, reasonable use and wear thereof and damage by the elements excepted."

Immediately after the lease was made defendant began storing in said building tomato pulp purchased in cans from outside packers, devoting to that purpose the entire second floor, which was approximately 45 feet wide and 285 feet long.   It at one time had upon that floor 24,327 cans, which it began to remove about a month later at the rate of 200 a month, increasing to 200 a week until the last of October, 1919, when the Federal authorities took possession of the stock of pulp stored there under the pure food law, and stopped defendant from disposing of or removing any of it.

In about 90 days after defendant took possession there was considerable evidence of overloading the floor.   The parties consulted together about this and plaintiff then furnished about $75 worth of material which defendant used to strengthen the building. Some bridging was put in between joists with planks cleated on to them, and additional posts were set up. After this there was further evidence of overloading to which defendant's attention was called and during the summer of 1919 it added more posts and cleats. When warm weather came in the spring of 1919 the cans of pulp stored in the second story of the building commenced bursting and their liberated contents leaked down through the floor upon property of plaintiff.   Its manager thereafter insisted his company should be reimbursed by defendant for resulting damages.   The subject-matter of their contention at that time was adjusted by defendant paying plaintiff

$100, a receipt for which was given, dated October 15, 1919, reading as follows:

"Received from the Thomas Canning Co. the sum of $100 in full payment for damages done on account of leakage of pulp, etc., through the floor in the building leased by the Thomas Canning Co. located at 503 Grandville avenue, Grand Rapids, Michigan.

(Signed)   "METZGAR REGISTER COMPANY."

After October 30, 1919, when Federal officers took possession of the pulp and forbid defendant removing any, they kept control of it and were for that purpose in practical possession of the portion of the building in which it was stored until April, 1920, when all pulp was removed from the second floor, which was then leased to an upholstering company.   Defendant yet had some pulp in small cans stored on the first floor and continued to pay rent as provided in the lease until those cans were removed, on June 10, 1920, when, agreeable to both parties, their relations as landlord and tenant terminated.   After the government took possession, bursting of the cans on the upper floor and leaking of the pulp continued, in what proportion to that which occurred before is a question of fact.

During defendant's tenancy plaintiff was engaged in the business of manufacturing metal "account systems," or registers, occupying the unrented portion of the first floor of the building immediately under where defendant had stored its pulp.   Quantities of this, freed by the bursting cans, leaked through the second floor upon plaintiff's stock and machinery, seriously damaging the same, as plaintiff claims, particularly in causing corroding of metal parts of its finished and unfinished registers.   On September 2, 1920, plaintiff brought this suit to recover for damages to its building claimed to have resulted from defendant overloading the second floor, and to its registers caused by the leaking pulp.   The case was tried be-

fore the court without a jury, resulting in a judgment for plaintiff of $2,777.96.

Defendant's counsel states his major grounds for reversal as follows:

"(1) The claim of plaintiff was settled October 15, 1919, whatever damage had been done to the building had then occurred, whatever was caused by leaking pulp afterwards was while the government was in control and defendant is not liable for it.

"(2) The covenant in the lease to repair did not cover the period after the lease expired and whatever damage there was to the building was done before that time and was settled for October 15, 1919.

"(3) The defendant was informed, and expert advice corroborated it, that the upper floor would bear a weight of 150 pounds to the square foot, less than 100 pounds to the square foot was put upon it, consequently the damage was not the fault of defendant."

Defendant's claim of a settlement in full for all damages prior to October 15, 1919, is not sustained by either the written receipt or oral evidence. Pulp leaking through the floor during the warm weather was at that time plaintiff's active cause of irritation and claim for compensation. An employee called by plaintiff, who went to work there early in the spring of 1919 when the "weather was yet cold," testified:

"There was no difficulty about material leaking through from above when I came there, not until the warm weather came. Then it started to burst and leak through onto both the raw material and finished product."

Plaintiff's manager then protested and demanded $150 damages, but in October, when summer was over and winter coming on, accepted $100 and gave defendant a receipt "in full payment for damages done on account of leakage of pulp, etc., through the floor of the building leased by the Thomas Canning Co." The plain wording of the receipt shows it was intended

to and did cover only damages done by leakage through the floor.

Defendant also claims that the covenant in its lease to repair did not cover the period of possession after its lease expired, predicated on the proposition that the lease was for but a year, and the provision in it relative to another year "was not for a renewal of the lease but for an option for a second year," and after the first year expired defendant only held under a new, "oral lease" with no covenant to repair shown.

The "option for a second year" was an executory unilateral contract which became binding upon both parties when defendant exercised its privilege and gave notice within the provided time. In such case, unless otherwise specified, the conditions of the new term are the same as the first except the privilege of renewal. *Andrews* v. *Creamery Co.*, 118 Iowa, 595 (92 N. W. 706). There is nothing in the lease indicating any further writings between the parties are required to make the contract for a second year effective, beyond a written notice by defendant of its election for the optional term which it timely gave, thereafter continuing in possession and paying accepted rent until the lease was terminated by mutual consent.

Neither is defendant's denial of responsibility after government officials took possession of the pulp and forbid its removal tenable. By its express covenant to repair it bound itself to that duty even against the acts of a third party. It stored the offending goods in the building and, when they were seized by the government in condemnation proceedings, took no steps before the court in which the matter was pending, or otherwise, to relieve the situation. In *Beekman* v. *Van Dolsen*, 18 N. Y. Supp. 376, cited by defendant, there was active effort by defendant to prevent the damage caused by public authorities, even instituting

litigation to that end.     That a proper effort on defendant's part would have availed is indicated here by the fact that as warm weather returned plaintiff, though a stranger to the proceedings, was successful in obtaining an order from the court for removal of the goods held by the Federal officers for condemnation to another storage.     By the terms of this lease defendant was under an express covenant to repair.

"It has been the established rule of the common law for ages that an express covenant to repair binds the covenantor to make good any injury to the demised premises which human power can remedy even if caused by storm, flood, fire, inevitable accident or the act of a stranger."     3 Sutherland on Damages (4th Ed.), p. 3150, citing numerous decisions.

. It is further contended that when the parties negotiated the lease plaintiff's manager told defendant the second floor was safe for a load of 200 pounds to the square foot, corroborated by expert advice, while the load placed on it did not exceed 100 pounds to the square foot of floor space and consequently the damage from that source, if any, was not due to the fault of defendant but to inherent defects in the building.     Whatever may have passed between the parties on that subject during their negotiations, nothing touching it appears in the written lease, which cannot be modified by oral testimony as to what was said and understood between them prior to its execution. Plaintiff's manager denied making any representation as to what load the floor would stand prior to execution of the lease, but stated that a Mr. Osgood whom he consulted said it was safe for 150 pounds per square foot and he then told defendant's president "the upper floor should not be loaded to exceed 150 pounds to the square foot," while he found a space in the southwest corner 14½ by 18½ feet loaded with 1,056 cans weighing 47 pounds each, making 196 pounds to the square

foot, and the most serious damage to the floor and wall was in that end of the building.

In any aspect of that contention nothing appears to relieve defendant from its express covenant to repair. The trial court found that the overloading of the second floor and leakage complained of damaged the interior and walls of the building to the extent of $1,708. This finds support in the practically undisputed testimony of competent witnesses to the cost of replacing and repairing the various broken, rotten or otherwise injured parts.

Plaintiff claimed and its testimony showed that most of the injury by leakage to plaintiff's register material occurred between October, 1919, when the pulp was seized, and the time of its removal in April, 1920; that while defendant was in charge of it prior to October 15th the contents of burst cans was for the most part scraped together and put in barrels with a scoop shovel, and sometimes sawdust used to prevent its leakage through the floor; but that after the Federal officers took possession no effort was made to clean it up and from then on a careful estimate of spoiled material, labor in caring for stock, refinishing, etc., was made, the items of which amounted to $936.30 when the pulp was finally removed. Beyond what inference, if any, might be drawn from plaintiff's having accepted $100 in full for all damage from leakage up to October 15th, this testimony stood undisputed. The trial court found as a fact plaintiff had sustained damages to its registers and stock in that amount subsequent to giving the receipt of October 15, 1919, saying in part:

"Defendant took no steps to have said libeled and damaged goods removed from the second floor of said leased premises, defendant placed this tomato pulp in said building and knew for considerable time before it was libeled that the cans were bursting and damage being almost continually done to plaintiff's building

and its register material, but did not remove or take any steps to remove it before it was libeled or afterwards. Defendant knew these cans were liable to burst and their contents do damage not only to the building, its floors and joists, but also to the finished and unfinished products of plaintiff on the floor below. The government did not rent these premises and there was no contract between the government and the plaintiff with respect to these goods."

It is not shown that overloading the floor caused or contributed to the cans of fermenting pulp bursting and it is undoubtedly true that defendant's covenant to repair the leased premises and return them in as good condition as when taken, reasonable use, wear and damage by the elements excepted, did not directly cover damage to plaintiff's personal property caused by leakage upon it from defendant's personal property stored above in the leased portion of the building; but under the lease defendant had exclusive possession of the floor where it stored the pulp which was liable to and did burst its containers. During that time it took measures to care for the same and, as indicated by the adjustment, minimized the damages to a comparatively small amount, while after the Federal authorities seized and marked it "condemned," defendant apparently assumed itself freed from all responsibility and did nothing further to relieve the situation it had created. Although it appears the officers in charge stopped defendant from removing and disposing of the condemned pulp it is not shown that they did or would prevent its former efforts to care for the contents of the bursted cans and protect plaintiff's property from injury.

Defendant had set in motion the chain of circumstances which resulted in continuing damage to plaintiff's personal property from leakage of its fermenting pulp and when proceedings were instituted to condemn it took no steps to secure removal of the cause

of damage. Plaintiff was in no sense responsible for or a party to defendant's trouble with the Federal authorities. Between these parties their rights and duties remained unchanged and the pulp defendant had stored in the building was yet its property. Underlying its contractual duties as a tenant were its obligations to plaintiff resting on the elementary principle that each must so care for and use that which belongs to him as not to injure others. Failing in this duty it was holden to respond accordingly. As plaintiff's testimony to the amount of damages suffered from defendant's delinquency in that particular is met by no evidence to the contrary, we discover no occasion to disturb the findings and conclusions of the lower court.

The judgment is therefore affirmed.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.